Act No. 360 of 1940 authorized the two minor children of Mrs. Virginia Hamker Bourg, deceased, to file suit against the State of Louisiana, through the Louisiana Highway Commission, upon their claim for damages resulting from an accident which caused the death of their mother and personal injury to these minor children, which accident was claimed to have *Page 205 
been caused by the negligence of employees of the Louisiana Highway Commission. Under authority of said act, Mrs. Felicia Bourg LeBlanc, the legal tutrix of the minors, Morgan and Harry Bourg, filed this suit in behalf of said minors against the Louisiana Highway Commission claiming damages in the sum of $17,500 for both of said minors, viz., the sum of $8,500 for Morgan Bourg, and $9,000 for Harry Bourg.
The petition alleges that on September 17, 1939, at about 6:30 o'clock P.M., the mother of said two minors, Mrs. Virginia Hamker Bourg, widow of Alidore Bourg, was crossing the lift bridge that spans Bayou Terrebonne, in the town of Houma, with these children and when she and her children had almost crossed the said bridge, it tilted or lifted from its closed and horizontal position on its foundations and raised to a perpendicular position, thereby causing Mrs. Bourg and her two children who were on the high side of said bridge to be thrown and catapulted to the pavement, a distance of approximately 45 feet; that as a result of the injuries received in said fall, Mrs. Bourg died shortly thereafter; that the minor, Morgan Bourg, aged 12 years, received a fracture of his right clavicle, and the minor, Harry Bourg, aged 9 years, received a fracture of the lower right tibia and fibula. The claims for the damage are made up of $7,500 to each of said minors for the loss of love, affection, care, guidance and support of their mother who lost her life in the said accident; and in addition thereto, $1,000 to Morgan Bourg for the personal injuries which he received, and $1,500 to Harry Bourg for the injuries which he received in the accident.
The trial judge rendered judgment in favor of each of said minors for $2,000 for the loss of love, care, protection and support of their mother and in addition thereto, allowed Morgan Bourg $600 for personal injuries and Harry Bourg $800 for personal injuries, making a total allowance to Morgan Bourg of $2,600 and to Harry Bourg a total allowance of $2,800. From this judgment the Highway Commission has appealed, and the plaintiff has filed an answer to the appeal asking that the judgment be amended increasing the amount of the awards to that amount claimed in the petition.
The petition alleges that the cause of the lifting or tilting of said bridge was the breaking of the cables which hold down the bridge when it is closed; that the accident was caused solely by the negligence of the agents and employees of the Highway Commission in failing to keep this bridge, which forms part of a state highway, in proper and safe condition. The Highway Commission denied the accident, and also denied that it was guilty of any negligence, and made the further allegation that the bridge was regularly inspected and no defects in said bridge or any of its parts were observable from a careful and prudent inspection; that said bridge was being maintained in a prudent and careful manner.
No particular acts of negligence on the part of the Highway Commission were set forth in the petition, however, on the trial of the case, the plaintiff introduced evidence to show the cause of the lifting or tilting of the bridge, with the purpose of showing particular acts of negligence on the part of agents and employees of the Highway Commission. After a careful review of the evidence in the case, we have come to the conclusion that the plaintiff has shown by a preponderance of the evidence sufficient facts to justify the finding that the accident was caused by the negligence of the agents and employees of the Highway Commission in failing to properly inspect said bridge and keep it in a safe condition for the traveling public. It is therefore unnecessary for us to discuss or apply the doctrine of res ipsa loquitur.
The evidence clearly shows that the lifting of this bridge was caused by the breaking of two cables which were used to hold the bridge in a closed or horizontal position on its foundation. The bridge is what is known as the bascule type of bridge operated by motor power. The bridge is raised for the passage of boats on the Bayou by cables wound around a drum operated by motor power. Other cables operated by the same motor pull down the bridge and hold it in a closed position, keeping it from tilting back or rising from its foundation. The two cables holding down the bridge were 5/8 inch steel cables.
On the day of the accident, the bridge tender had raised the bridge for the passage of a boat and then lowered it for traffic. Several cars passed over the bridge after it had been lowered to its position. When the deceased and her two children were crossing the bridge, they *Page 206 
were the only ones on it, a car just having gotten off the bridge, when it lifted to a perpendicular position just before these pedestrians had gotten across. They were thrown to the pavement by the lifting of the bridge, a distance of 40 or 45 feet. Mrs. Bourg died from the injuries she received in the fall a few hours thereafter, and the two minors received the injuries set out in their petition.
The bridge tender testified that he had noticed for several days previous to the accident that the cables holding down the bridge were loose and had too much slack in them. When the cars would get off the bridge, he noticed that it would vibrate, or go up and down on its foundation. This vibration of the bridge was caused by the slack in the cables preventing them from holding down the bridge on the foundation. The bridge tender testified that he notified the authorities of the Highway Commission some two or three weeks before the accident that something was wrong with the bridge. No one came to inspect the bridge or remedy the trouble while he was on duty during twelve hours of the day. He worked every day from midnight to noon.
While the authorities of the Highway Commission denied having received any notice from the bridge tender of any trouble or defect in the bridge, yet the very fact that the bridge tender himself observed for two or three weeks before the accident that the bridge was not operating properly and there was too much slack in the cables, was sufficient notice to the Highway Commission, as the bridge tender himself was an employee of the Commission and had charge of the operation of the bridge. While the evidence shows that these cables were greased at regular intervals, only casual and more or less perfunctory inspections were made to see whether or not there were any defects in the cables and steel strands making up these cables. The bridge tender testified that during the two years while he was attending the bridge, he could recall only one inspection made of it by officials of the Highway Commission during that time. He worked on the bridge half of the time, and it is reasonable to assume that, if the agents of the Highway Commission had inspected the bridge every two or three weeks as they claimed, this bridge tender would have seen them doing so more frequently than once during two years.
It is contended by the Highway Commission that inspections were made of the bridge and cables at more or less regular intervals, and if there were defects in the cables, they were latent and could not be detected by an ordinary inspection. It is unnecessary to determine whether or not the defects in the cables could have been discovered by an inspection as, according to the testimony of the bridge tender himself, the action of the bridge in its operation, as well as the slack in the cables, was known by the bridge tender to exist for some two or three weeks before the accident, and no action was taken to take up the slack in the cables or remedy the condition which prevented the bridge from holding tight on its foundation when closed for traffic.
It is also shown that after the accident occurred, a locking device was put on the bridge to hold it down when closed for traffic and new cables were put in. While it might not have been an absolutely necessary precaution to put on this locking device, it is shown by the testimony of those who are familiar with the operation of this type of bridge that such a locking device is advisable as a precautionary measure. The fact that this bridge was held down only by these cables should have been sufficient notice to the Highway Commission to use great care in seeing that they were kept in proper condition and were working properly at all times. The extreme danger to the traveling public arising from a possibility of the lifting of this bridge from its foundation was such as to require somewhat extra precautions to secure safety in this respect.
Plaintiff undertook to show by an engineer that the bridge was not properly constructed; that the diameter of the drums on which the cables wound was too small and locking devices were not provided. However, it is shown that the bridge is one designed and erected by reputable bridge concerns, and we do not find that the negligence of the Highway Commission consisted in the design and construction of the bridge, but in its failure to properly inspect the bridge and see that it was kept in a safe condition and its operation made safe for traffic. It takes little engineering skill to determine when there is too much slack in a cable operating around a pulley, as common experience teaches us that when the slack in a cable is taken up by the revolutions *Page 207 
of the drum around which it is being wound, there is a sudden and violent jerk on the cable. Regardless of the fact that a small amount of slack in the cable might be necessary for starting the motor, as some of defendant's witnesses claim, it is obvious that enough slack in the cables to permit the bridge to bounce up and down on the foundation when cars pass over it would indicate to any one, as it did to the bridge tender, that something was wrong with the bridge and the cables holding it down.
Section 13 of Act No. 95, Ex. Sess. of 1921, Dart's Statutes, § 3567, makes it the duty of the Highway Commission to maintain an efficient and continuous system of inspection for the maintenance, repair and inspection of state highways and bridges so that these highways and bridges may be kept in proper condition at all times. The Highway Commission is not required under this law, nor by the general law of torts, to insure the safety of the public in traveling over the bridges constructed and maintained by the State, but it is required to use ordinary and reasonable care in inspecting and repairing these bridges and in keeping them in a reasonably safe condition. 11 C.J.S., Bridges, p. 1091, §§ 54 and 55. The State having waived its immunity from suit in this case, we conclude that plaintiff has shown that the accident out of which the claims of these minors grew was caused by the negligence of the agents and employees of the Highway Commission, and liability for the damage must be placed on the defendant.
In fixing the awards, the trial judge gave very clear and forceful reasons for his conclusions. We see no reason to disturb his findings.
Both of these boys are mentally deficient and had been inmates of the State Colony and Training School at Alexandria for several years before the accident, and they were out on a parole in order to visit their mother at the time of the accident. The mother had several other children, and the family lived in rather hard circumstances. The mother earned about five dollars per week doing menial labor and used this meager income to help support her family, including these two minors while they were with her. As soon as they were sufficiently recovered from their injuries, these two boys were returned to the Training School where they now remain as inmates of that institution.
In fixing the damage sustained by these two minors in the loss of their mother, all of the circumstances must be taken into consideration. Awards in other cases can give but little assistance. While these two children, on account of their mental condition, might not be able to appreciate the loss of a mother as fully as a normal child of their age could and would feel such a loss and grieve over it, yet it is not for us to say that they do not feel and realize that loss and that they will continue to feel it more and more as they become more mature in years, notwithstanding their mental condition. And while they have been and are now being taken care of by the State and were necessarily deprived of a good part of the love and companionship of their mother, yet her solicitude for them continued as is shown from the fact that she had secured a leave of absence for them to visit her before the accident occurred.
Morgan Bourg received a fracture of his right collar bone and this injury has healed. The evidence shows that an injury of this kind in a child of his age would ordinarily heal in two or three months. The injury, of course, caused a certain amount of pain and discomfort, and we think the award of $600 for the injury is not out of line. Harry Bourg fractured both bones of his right leg between the knee and the ankle. The testimony is that an injury of this kind ordinarily heals in about six months. We cannot say that the award of $800 for this injury is either too large or too small.
For these reasons, the judgment appealed from is hereby affirmed at the cost of defendant in both courts. *Page 208